UNITED STATES DISTRICT COURT

DISTRICT OF IDAHO

----oo0oo----

ALAN PESKY and WENDY PESKY,           NO. CIV. 1:10-186 WBS

            Plaintiffs,
                                      MEMORANDUM AND ORDER RE:
      v.                              MOTIONS FOR SUMMARY JUDGMENT
                                      AND MOTION TO STRIKE
UNITED STATES OF AMERICA,

            Defendant.
_____/

----oo0oo----

        Plaintiffs Alan and Wendy Pesky brought suit against
the United States of America seeking a refund for taxes,
penalties, and interest assessed against them for the 2003 and
2004 tax years.  Currently before the court are the parties'
cross motions for summary judgment pursuant to Federal Rule of
Civil Procedure 56 and the Peskys' motion to strike certain
evidence and testimony from the United States' motion for summary
judgment.  (Docket Nos. 105, 106, 108.)

        The parties' dispute can be divided into two general
topics: (1) deduction of the value of a conservation easement

1

1   limiting development of real property in Idaho ("Conservation
2   Easement"), and (2) deduction of various other expenses.  After
3   carefully considering the parties' briefs, the court finds that
4   these two issues are best addressed in separate orders.  This
5   Order addresses the parties' claims regarding the Conservation
6   Easement.

7   I.   Factual and Procedural Background

8        In May of 1985, Paul MacCaskill and John Hagestad
9   ("M&H") owned three parcels of undeveloped land in Blaine County,
10  Idaho ("Ketchum Property").  (Yost Decl. Ex. 1 (Docket No. 105-
11  4).)  Another property owned by Mary Hemingway, ("Hemingway
12  Property") abuts the Ketchum Property to the south.  (Id. ¶ 14.)
13  Hemingway had granted M&H an easement over the Hemingway Property
14  to access the Ketchum Property ("Hemingway Easement"), but the
15  Hemingway Easement was arguably legally defective.  (Id. ¶ 17;
16  id. Ex. 3.)  Upon Hemingway's death, The Nature Conservancy
17  ("TNC"), a non-profit environmental conservation organization,
18  became the owners of the Hemingway Property.  (Id. Ex. 3.)

19       TNC was concerned that M&H were going to develop the
20  Ketchum Property and preferred that the Ketchum Property be
21  accessed over an alternate easement approaching from the north.
22  (Id. Ex. 5.)  It also appears that M&H and TNC believed that a
23  driveway to the Ketchum Property over the Hemingway Easement
24  would require approval from the City of Ketchum ("City") and
25  Blaine County ("County").  (Id.)  The dispute between M&H and TNC
26  eventually resulted in M&H filing an action to perfect the
27  Hemingway Easement in state court.  (Id. Ex. 1, Ex. 2 at 19:2-
28

2

22:4.)[1]

In a November 20, 1989 letter, Edward Lawson, attorney for TNC, sent M&H a settlement proposal which suggested that TNC would agree not to oppose a driveway application with the City and County while also amending the Hemingway Easement to provide for two homesites. (Id. Ex. 5.)  In exchange, M&H would give TNC a conservation easement on a portion of the Ketchum Property and would also make a $150,000 cash contribution. (Id.)  TNC and M&H did not reach a settlement.

Shortly thereafter, Paul Street, attorney for the Peskys, proposed a similar transaction in a confidential memorandum to Alan Pesky: (1) TNC would obtain an option to purchase the Ketchum Property and assign that option to Mr. Pesky; (2) TNC would give Mr. Pesky an oral commitment for access over the Hemingway Property if the Peskys could not obtain access over other properties; and (3) the Peskys, "at a later date," would contribute two of the three lots on the Ketchum Property to TNC "for charitable deduction for more than option [sic] based

---

[1]     The Peskys move to strike, among other documents, Bruce Runnel's deposition testimony as a designated organizational witness under Federal Rule of Civil Procedure 36(b)(6) for lack of foundation. (Peskys' Mot. to Strike at 13-19 (Docket No. 108-1.)  As this court has noted before, "seemingly appropriate objections based on hearsay and failure to authenticate/lay a foundation are difficult to address away from trial" because, for example, "if one witness attempts to testify unsuccessfully [at trial] about matters regarding which that witness lacks personal knowledge, another witness may later be able to testify to the same evidence based upon her firsthand knowledge." Burch v. Regents of Univ. of Cal., 433 F. Supp. 2d 1110, 1122 (E.D. Cal. 2006) (Shubb, J.).
     The court has considered the Peskys' motion to strike. The court does not rely upon the vast majority of the material to which the Peskys object.  To the extent the court relies upon any evidence objected to therein, the court will accordingly deny the motion without prejudice to raising the objections at trial.

1 upon access to property." (Id. Ex. 6.)

2     On April 2, 1993, TNC paid $50,000 to acquire an option

3 to purchase the Ketchum Property for approximately $1.6 million

4 ("Option"). (Id. Ex. 7.)  The Project Resolution presented to,

5 and subsequently passed by, TNC's Board of Governors provided

6 that TNC would obtain the Option while simultaneously raising the

7 purchase price of $1.6 million or "locating an individual willing

8 to purchase it for a single home site," who "would then

9 contribute all of the development rights on the 30+ acres to

10 [TNC] through a conservation easement or other mechanism." (Id.

11 Ex. 8.)

12     On August 3, 1993, Street sent TNC a written offer to

13 purchase the Option that included the following terms: (1) Pesky

14 and Paul Stern[2] would pay TNC $50,000 for the Option and would

15 also each pledge to pay $200,000 apiece over a four year period;

16 while (2) TNC would provide written agreements guaranteeing

17 access over the Hemingway Easement to three home sites on the

18 Ketchum Property; and (3) TNC would agree to support the Peskys'

19 application to the City for construction of a driveway on the

20 Hemingway Easement. (Id. Ex. 9.)

21     After negotiations between late August and late

22 September, 1993, TNC and the Peskys entered into a series of

23 agreements on or around September 29, 1993:

24

25     [2]    Paul and Wendy Stern were apparently co-owners of the
26 Ketchum Property and were involved in many of the transactions
   and documents at issue.  Entities controlled by the Peskys, such
   as FAWPEAS, were also involved.  (See, e.g., Yost Decl. Ex. 41.)
27 For ease of description and because the parties themselves refer
   generally to the Peskys when describing the facts, the court will
28 do the same.

- The <u>Assignment Agreement</u> - in which the Peskys paid TNC $50,000 to TNC, while TNC assigned the Option to Pesky, agreed to support the Peskys' applications for driveway approval with the City and County, and agreed to enter into the Driveway Easement and Easement Agreement, (<u>id.</u> Ex. 19);

- The <u>Driveway Easement</u> - in which TNC granted the Peskys an easement over the Hemingway Property to the Ketchum Property, (<u>id.</u> Ex. 22);

- The <u>Easement Agreement</u> - in which the Peskys agreed to limit the height of structures on the Ketchum Property to twenty-five feet, (<u>id.</u> Ex. 23);

- The <u>Pledge Agreement</u> - in which the Peskys agreed to convey "all right to develop or improve the [Ketchum] Property except for one single-family residence" at a later date and pay $400,000 to TNC for a new office building; the Pledge Agreement provided that its existence be kept confidential unless TNC anticipated default by the Peskys, (<u>id.</u> Ex. 20); and

- <u>Deeds of Trust</u> - securing performance of the Pledge Agreement by naming TNC as beneficiaries to other real property owned by the Peskys, (<u>id.</u> Ex. 21).

On September 29, 1993, the Peskys exercised the Option and purchased the Ketchem Property for $1.6 million. (<u>Id.</u> Ex. 25.) Just a few months after purchasing the Ketchum Property, the Peskys engaged a local real estate agent to market and sell the Ketchum Property for a price between $6.5 and $9.5 million. (<u>Id.</u> Ex. 26.) The Peskys sought approval of a driveway over the

5

1   Hemingway Property at Planning and Zoning Commission meetings and

2   through a series of applications. (Id. Exs. 27, 28, 30-34.)  TNC

3   representatives attended these meetings and allegedly supported

4   approval of the driveway. (Id. Ex. 38.)

5         Around March 7, 2002, the Peskys fulfilled the terms of

6   the Pledge Agreement by granting the Conservation Easement to

7   TNC. (Id. Ex. 41.)  The Conservation Easement limited

8   development to one single-family residence and a guest house.

9   (Id.)  The Conservation Easement also raised the height

10  restriction on Ketchum Property building from twenty-five to

11  thirty feet. (Id.)  Around the same date, the Peskys entered

12  into a driveway easement agreement with two other property owners

13  over whose land--in addition to the Hemingway Property--a

14  driveway would have to pass to access the Ketchum Property

15  ("Whitmyre Easement"). (Id. Ex. 40.)

16        On March 12, 2002, the Peskys sold the Ketchum Property

17  for $6,900,000 plus deferred interest. (Id. Ex. 42.)  The Peskys

18  claimed charitable contribution deductions for the value of the

19  Conservation Easement on their 2002, 2003, and 2004 tax returns.

20  In an appraisal submitted to the IRS, Mark Richey determined that

21  the Peskys' portion of the Conservation Easement was worth over

22  $3 million ("Richey Appraisal"). (Id. Ex. 43.)

23        The Internal Revenue Service ("IRS") allegedly issued

24  notices of deficiencies for the 2003 and 2004 tax years against

25  the Peskys, and the Peskys paid the assessments. (First Am.

26  Compl. ¶¶ 6-13 (Docket No. 72).)  Peskys brought suit against the

27  United States in April 2010 seeking recovery of taxes, penalties,

28  and interest assessed by the IRS for the 2003 and 2004 tax years.

6

1   (Docket No. 1.)  On September 20, 2011, the United States moved

2   to stay the action under 26 U.S.C. § 7422(e) because the IRS

3   issued new statutory notices of deficiency against the Peskys for

4   the 2003 and 2004 tax years.  (United States' Mot. to Stay

5   (Docket No. 58).)  The new notices of deficiency included

6   adjustments to income and expenses as to both Alan and Wendy

7   Pesky.  With respect to Alan Pesky, the new notices added a civil

8   fraud penalty under 26 U.S.C. § 6663.  (Id. at 2, Ex. B.)  The

9   IRS also issued a new statutory notice of deficiency against the

10  Peskys for the 2002 tax year.  (Id. at 2; FAC ¶¶ 15-19.)

11          After the court lifted the stay, the Peskys filed the

12  FAC.  The United States then brought counterclaims against Alan

13  Pesky[3] alleging fraud in the deduction of the Conservation

14  Easement and certain Schedule C business deductions.  (Docket No.

15  74.)  After the court partially granted the Peskys' motion to

16  dismiss the counterclaims, (Docket No. 84), the United States

17  filed amended counterclaims, (Docket No. 85).

18          The United States now moves for summary judgment on the

19  issue of whether the Peskys are entitled to a charitable

20  deduction for the value of the Conservation Easement, arguing

21  that: (1) the Conservation Easement was a quid pro quo

22  transaction with TNC; (2) the Peskys failed to provide an

23  acknowledgment that they received goods and services in exchange

24  for the Conservation Easement; (3) the Richey Appraisal did not

25

26          [3]   The IRS does not assess fraud penalties against Wendy
    Pesky.  Instead, it only seeks accuracy-related penalties,
27  including a gross valuation misstatement penalty.  (United
    States' Mot. for Summ. J. at 23 n.14 ("U.S. MSJ") (Docket No.
28  105).)

7

1  consider the likelihood of development of the Ketchum Property;

2  and (4) the Richey Appraisal was not a qualified appraisal

3  because it did not include the terms of key agreements such as

4  the Pledge Agreement.  (U.S. Mot. for Summ. J. at 5 ("U.S. MSJ")

5  (Docket No. 105-1).)  The United States also moves for summary

6  judgment on accuracy penalties associated with the Conservation

7  Easement.  (Id.)  The United States explicitly does not move for

8  summary judgment on its counterclaims for a seventy-five percent

9  fraud penalty, as it "believes that this is an issue for trial."[4]

10 (Id. at 2.)

11       The Peskys file their own motion for summary judgment

12 on the following issues: (1) whether the Peskys' could deduct the

13 value of the Conservation Easement as a charitable contribution;

14 and (2) whether the Peskys fraudulently deducted the value of the

15 Conservation Easement and are therefore subject to the United

16 States' counterclaims for fraud penalties.  (Peskys Mot. for

17 Summ. J. at 2-3 ("Peskys MSJ") (Docket No. 106-1).)

18 II.  Legal Standard

19       Summary judgment is proper "if the movant shows that

20 there is no genuine dispute as to any material fact and the

21 movant is entitled to judgment as a matter of law."  Fed. R. Civ.

22 P. 56(a).  A material fact is one that could affect the outcome

23 ────────────────────

24       [4]  The United States clarifies that "because [it] is not
   moving on the issue of fraud, it is also not moving on any of
25 Plaintiffs' tax liabilities for 2002.  These liabilities were
   assessed after the statute of limitations in 26 U.S.C. [§]
26 6501(a) had expired, pursuant to an exception in § 6501(a)(1) for
   a false or fraudulent return.  Thus, to obtain a judgment on the
27 2002 liabilities, the United States would first need to prove
   that some portion of the return was false or fraudulent."  (U.S.
28 MSJ at 2 n.1.)

1  of the suit, and a genuine issue is one that could permit a

2  reasonable jury to enter a verdict in the non-moving party's

3  favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

4  (1986).

5       The party moving for summary judgment bears the initial

6  burden of establishing the absence of a genuine issue of material

7  fact and can satisfy this burden by presenting evidence that

8  negates an essential element of the non-moving party's case.

9  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

10  Alternatively, the moving party can demonstrate that the

11  non-moving party cannot produce evidence to support an essential

12  element upon which it will bear the burden of proof at trial.

13  Id.

14       In deciding a summary judgment motion, the court must

15  view the evidence in the light most favorable to the non-moving

16  party and draw all justifiable inferences in its favor.  Id. at

17  255.  "Credibility determinations, the weighing of the evidence,

18  and the drawing of legitimate inferences from the facts are jury

19  functions, not those of a judge . . . ruling on a motion for

20  summary judgment . . . ."  Id.

21       The court notes that the vast majority of cases cited

22  by the parties and considered by the court in connection with

23  this motion were decided by the Tax Court after a bench trial,

24  presumably because the taxpayers challenging the IRS assessments

25  at issue in those cases, unlike the Peskys here, did not pay the

26  assessments before bringing suit.  See Olshausen v. Comm'r, 273

27  F.2d 23, 27 (9th Cir. 1959) ("Having taken advantage of the

28  deficiency notice procedure by filing a petition in the Tax Court

without paying the tax first, petitioner now makes the claim that he was deprived thereby of a jury trial.  Such deprivation was due to his own act.  If he desired a jury trial, he should have paid the tax first and then sued for a refund in the district court.  There is no right to a jury trial without paying first as a statutory matter, and no right to a jury trial at all in tax matters as a constitutional requirement." (internal citations omitted)).

III.  <u>Analysis</u>

    A.  <u>Quid Pro Quo Exchange</u>

"Section 170(a) of the Internal Revenue Code of 1954 allows a deduction for charitable contributions . . . ." <u>Collman v. Comm'r</u>, 511 F.2d 1263, 1266 (9th Cir. 1975); <u>see</u> 26 U.S.C. § 170(a).  "A charitable contribution is a gift of property to a charitable organization, made with charitable intent and without the receipt or expectation of receipt of adequate consideration." <u>Id.</u> (citing <u>Hernandez v. Comm'r</u>, 490 U.S. 680, 690 (1989); <u>United States v. Am. Bar. Endowment</u>, 477 U.S. 105, 116-18; 26 C.F.R. § 170A-1(h)(1)-(2)).  "While a taxpayer is generally not allowed a charitable deduction for a gift of property consisting of less than an entire estate in that property, an exception is made for a 'qualified conservation contribution.'" <u>Mitchell v. Comm'r</u>, 138 T.C. 324, 329 (2012); <u>see</u> 26 U.S.C. §§ 170(f)(3)(A), (f)(3)(B)(iii), (h).

"The <u>sine qua non</u> of a charitable contribution is a transfer of money or property without adequate consideration." <u>Am. Bar Endowment</u>, 477 U.S. at 118.  As explained by the Supreme Court:

1    If a transaction is structured in the form of a _quid pro_
2    _quo_, where it is understood that the taxpayer's money
     will not pass to the charitable organization unless the
3    taxpayer receives a specific benefit in return, and where
     the taxpayer cannot receive the benefit unless he pays
     the required price, then the transaction does not qualify
4    for the deduction under section 170.

5    Graham v. Comm'r, 822 F.2d 844, 849 (9th Cir. 1987), aff'd sub

6    nom. Hernandez v. Comm'r, 490 U.S. 680 (1989).  "The

7    consideration need not be financial; medical, educational,

8    scientific, religious, or other benefits can be consideration

9    that vitiates charitable intent."  Scheidelman v. Comm'r, 682

10   F.3d 189, 199 (2d Cir. 2012).

11        "In ascertaining whether a given payment was made with

12   the expectation of any _quid pro quo_, the IRS has customarily

13   examined the external features of the transaction in question."

14   Hernandez, 490 U.S. at 690.  This "structural analysis" "has the

15   advantage of obviating the need for the IRS to conduct imprecise

16   inquiries into the motives of individual taxpayers."  Id. at 690-

17   91.

18        Neither party cites a case in which a court decided at

19   summary judgment whether or not a deduction under § 170 was

20   disallowed as a matter of law due to receipt of substantial

21   benefit, and the Ninth Circuit has upheld jury instructions when

22   the district court conducted a jury trial on the issue.  See

23   Stubbs v. United States, 428 F.2d 885, 887 (9th Cir. 1970); see

24   also Patel v. Comm'r, 138 T.C. 395, 425 (2012) (Gale, J.

25   dissenting) (after disagreeing with the majority that a claimed

26   deduction was barred because it was a partial interest in

27   property, explaining that "[p]etitioners must show that the value

28   of the house, taking into account the conditions on its donation,

11

1  exceeded the value of the benefit they received from the fire
2  department in the form of demolition services," and expressing
3  that the better path would be, "if petitioners wished, [to]
4  proceed to trial on that question of fact"); McLennan v. United
5  States, 24 Cl. Ct. 102, 105-06 (1991) (noting that the court,
6  while granting summary judgment on other issues, held a trial on
7  the issue of whether a contribution was part of a quid pro quo
8  transaction).

9       Here, the United States contends that the donation of
10 the Conservation Easement was part of a larger quid pro quo
11 transaction between the Peskys and TNC.  Under the United States'
12 description of the transaction, TNC provided: (1) an option to
13 buy the property for $2 million; (2) an easement over the
14 Hemingway Property; and (3) support for the Pesky's driveway
15 applications before the City of Ketchum.  The improved access
16 allegedly increased the value of the Ketchum Property.  In
17 exchange, the Peskys allegedly provided $450,000, a height
18 restriction on buildings, and the eventual Conservation Easement
19 that restricted development on the property to a single home
20 site.  (See U.S. MSJ at 3-4, 10-11.)

21      According to the United States, the Peskys and TNC
22 attempted to mask the quid pro quo nature of the transaction by
23 breaking the transaction into multiple documents, keeping the
24 Pledge Agreement secret, and recording the Conservation Easement
25 long after TNC conferred the benefits of the Assignment Agreement
26 and Driveway Easement on the Peskys.

27      Looking to the structure of the transaction, the Pledge
28 Agreement itself provides that it "arises out of and is integral

12

1  with the Assignment Agreement of even date between the parties."
2  (U.S. MSJ Ex. 20.)   The Pledge Agreement and Assignment Agreement
3  were signed on the same date.  (<u>Id.</u> Exs. 19, 20.)   In
4  correspondence during negotiations, multiple documents refer to
5  the "Nature Conservancy Transaction" or the "The Nature
6  Conservancy Pesky/Stern Transaction" in the singular.  (<u>Id.</u> Exs.
7  11-18.)

8          While the United States has produced evidence that the
9  conservation easement was part of a <u>quid pro quo</u> transaction, the
10 evidence is not so convincing as to compel summary judgment in
11 its favor.  The Assignment Agreement's explicit terms provides
12 that TNC will assign an option to purchase the Ketchum Property,
13 will support the Pesky's applications for driveway approvals with
14 local authorities, and will agree to enter into the Driveway
15 Easement providing access over the Hemingway Property--all for
16 $50,000 from the Peskys.  Nowhere does the Assignment Agreement
17 discuss a restriction on development; nor does it provide that
18 the benefits it confers are consideration for the Pledge
19 Agreement and subsequent Conservation Easement.  Both the
20 Assignment Agreement and the Pledge Agreement have clauses
21 providing that "the instrument constitutes the sole agreement
22 between the parties with respect to the subject matter hereof."
23 (<u>Id.</u> Ex. 19 ¶ 8; <u>id.</u> Ex. 20 ¶ 8.)

24         In the correspondence between the attorneys during the
25 negotiations, it does not appear that the two Agreements were
26 drafted as a single document.  Paul Street, the Peskys' attorney
27 at the time, admits that the two Agreements were reviewed at the
28 same time, but denies that the Pledge Agreement was negotiated as

1  consideration for the Assignment Agreement.  (Schwartzman Decl.

2  Ex. 1 at 69:4-11, 154:5-21 (Docket No. 110-2).)  Alan Pesky

3  similarly denied in a second deposition that the promises in the

4  Pledge Agreement were contingent upon the promises TNC made in

5  the Assignment Agreement.  (Id. Ex. 2 at 243:4-9.)

6       According to the Peskys, "trad[ing] a promise (i.e.,

7  pledge) to give a future undefined land interest which 'might' or

8  'might not' be a conservation easement" cannot constitute a

9  sufficient benefit conferred to TNC such that the transaction

10 becomes a quid pro quo exchange.  (See Peskys Opp'n to Mot. for

11 Summary J. at 14-16 ("Peskys Opp'n") (Docket No. 110).)  The

12 Peskys cite IRS regulations and cases providing that a promise to

13 pay is not a "contribution" to a charitable organization for the

14 year in which the promise is granted.  See Rev. Rul. 82-197,

15 1982-2 C.B. 72; Don E. Williams Co. v. Comm'r, 429 U.S. 569, 578

16 (1977); Musgrave v. Comm'r, 80 T.C.M. (CCH) 341, 2000 WL 1258400,

17 at *4-5 (2000).

18       The cases and regulations cited by the Peskys focus on

19 whether a contribution was completed within the taxable year and

20 do not decide whether a promise can constitute a benefit that

21 vitiates a contribution's charitable nature.  The Peskys fail to

22 provide a compelling reason why the court should exclude the

23 Conservation Easement from its quid pro quo analysis and focus

24 solely on the Pledge Agreement's promise to limit the property to

25 one homesite.

26       Furthermore, even if the court restricts its analysis

27 to the Pledge Agreement and adopts the Peskys' characterization

28 of it as a "promise to give a future benefit," (Peskys Opp'n at

14

15), cases have "den[ied] charitable contribution deductions
where taxpayers transferred property . . . in exchange for a
promise by the city to construct schools or widen roads."
Osborne v. Comm'r, 87 T.C. 575, 581 (1986) (emphasis added)
(citing Stubbs, 428 F.2d at 887).

In Stubbs, for example, taxpayers agreed to dedicate a
portion of property for a public road in exchange for rezoning of
their land.  Stubbs, 428 F.2d at 886.  The taxpayers transferred
the land to the city, and the city formally adopted the proposed
rezoning ordinance four months later.  Id.  The Ninth Circuit
found that there was sufficient evidence to support a jury
verdict against the taxpayers, noting that "as the jury found,
the 'gift' . . . was in expectation of the receipt of certain
specific direct economic benefits within the power of the
recipient to bestow directly or indirectly, which otherwise might
not be forthcoming."  Id. at 887.  The court rejected the
taxpayer's argument that no quid pro quo transaction could have
occurred because the dedication did not increase the value of
their property, explaining that the "[t]axpayers' subsequent
disappointment in the ultimate monetary value of the benefits
sought and received cannot affect the situation."  Id.  Even
assuming arguendo that the Peskys are correct in characterizing
the benefit allegedly received by TNC as a "promise to give a
future benefit," this does not preclude a finding that the
transaction was a quid pro quo exchange rather than a charitable
contribution.  See id.; Osborne, 87 T.C. at 581.

Ultimately, a reasonable juror could find that the
transaction detailed in the Assignment Agreement was a stand-

15

alone and self-contained transaction, and that the transfer of

property contained in the Pledge Agreement and Conservation

Easement was a separate contribution provided without

consideration from TNC.[5]   Looking to the external features of how

the transaction was structured, there is a genuine issue of

material fact as to whether the Peskys provided the Conservation

Easement "without the receipt or expectation of receipt of

adequate consideration." <u>Mitchell</u>, 138 T.C. at 329.   The court

will accordingly deny both parties' motions for summary judgment

based on this issue.

     B.   <u>Contemporaneous Written Acknowledgement of Goods and</u>

         <u>Services Received</u>

        The United States also argues that, because there is

"no genuine dispute that Mr. Pesky received substantial benefits

from TNC in exchange for the Conservation Easement," he failed to

disclose the goods and services provided in consideration for the

Conservation Easement in a contemporaneous written acknowledgment

as required by 26 U.S.C. § 170(f)(8)(B)(ii) and 26 C.F.R. §§

1.170A-13(f)(5) & (6).   (U.S.'s MSJ at 11.)   The United States

does not dispute that the Peskys submitted a letter from TNC,

created contemporaneously to the Conservation Easement,

confirming that TNC "provided no goods or services in exchange

---

[5]     The United States argues that, even looking to the
Conservation Easement alone, the fact that the Conservation
Easement raises the building height restriction from twenty-five
feet to thirty feet provides sufficient benefit to show a <u>quid
pro quo</u> transaction.  (U.S. MSJ at 11.)  Even adopting this
narrow view, the court declines to hold that, as a matter of law,
a five-foot building height increase would be adequate
consideration to show a <u>quid pro quo</u> transaction involving the
exchange of a conservation easement valued at over $6 million in
return.

1  for [the] gift." (Yost Decl. Ex. 45.)  Nor does the United

2  States object to the form or timing of the letter.  The United

3  States' claim appears to rely on the court finding that a good or

4  service was received in consideration for the Conservation

5  Easement.

6        As explained above, because a genuine issue of material

7  fact exists as to whether TNC provided any goods or services in

8  exchange for the Conservation Easement, the court will

9  accordingly deny the United States' motion for summary judgment

10 based on § 170(f)(8)(B) and the related regulations.

11      C.   Appraisal of the Deduction

12       The United States also moves for summary judgment on

13 the ground that, even if the Conservation Easement was a

14 charitable contribution, it was not properly appraised under IRS

15 regulations and therefore was wrongfully deducted.

16       Title 26 U.S.C. § 170 provides that "no deduction shall

17 be allowed under subsection (a) for any contribution of property

18 for which a deduction of more than $500 is claimed unless such

19 person meets the requirements of subparagraphs (B), (C), and (D),

20 as the case may be, with respect to such contribution."  26

21 U.S.C. § 170(f)(11)(A)(i).  Subparagraph (D) provides that when

22 claiming a charitable contribution of more than $500,000 for an

23 easement or other property that is not readily valued, the

24 taxpayer must include a "qualified appraisal" of the value of the

25 contribution to his tax return.  Id. § 170(f)(11)(D).

26       The IRS has established regulations detailing the

27 requirements for a qualified appraisal.  See generally 26 C.F.R.

28 § 1.170A-13(c)(3)(ii).  "The regulatory requirements of a

qualified appraisal are many . . . but generally require

information about the property, terms of the donation, identity

of the appraiser, and fair market value of the donation."

Scheidelman v. Comm'r, 682 F.3d 189, 194 (2d Cir. 2012).[6]  "The

---

[6]     Specifically, 26 C.F.R. § 1.170A-13(c)(3)(ii) requires that a qualified appraisal include:

(A) A description of the property in sufficient detail for a person who is not generally familiar with the type of property to ascertain that the property that was appraised is the property that was (or will be) contributed;

(B) In the case of tangible property, the physical condition of the property;

(C) The date (or expected date) of contribution to the donee;

(D) The terms of any agreement or understanding entered into (or expected to be entered into) by or on behalf of the donor or donee that relates to the use, sale, or other disposition of the property contributed . . .;

(E) The name, address, and (if a taxpayer identification number is otherwise required by section 6109 and the regulations thereunder) the identifying number of the qualified appraiser . . . . .;

(F) The qualifications of the qualified appraiser who signs the appraisal, including the appraiser's background, experience, education, and membership, if any, in professional appraisal associations;

(G) A statement that the appraisal was prepared for income tax purposes;

(H) The date (or dates) on which the property was appraised;

(I) The appraised fair market value (within the meaning of § 1.170A-1(c)(2)) of the property on the date (or expected date) of contribution;

(J) The method of valuation used to determine the fair market value, such as the income approach, the market-data approach, and the replacement-cost-less-depreciation approach; and

18

procedural regulations requiring an appraisal report and summary are designed to provide information 'sufficient to permit [the IRS] to evaluate the [taxpayer]'s reported contribution and monitor and address concerns about overvaluation.'" Kaufman v. Shulman, 687 F.3d 21, 29 (1st Cir. 2012) (alterations in original) (quoting Consol. Investors Grp. v. Comm'r, T.C.M. (CCH) 601, 2009 WL 4840246, at *23 (2009)).  If the appraisal fails to include one or more of the requirements of § 1.170-13(c)(3)(ii) and thus is not a "qualified appraisal," the deduction based upon the value of the alleged charitable contribution may be disallowed in its entirety.  See, e.g., Estate of Evenchik v. Comm'r, 105 T.C.M. (CCH) 1231, 2013 WL 424791, at *6 (2013) ("These defects [in the appraisal] prevented the Commissioner from properly evaluating the property interest contributed.  The Evenchiks are not, therefore, entitled to the deduction they seek.").

     One of the provisions at issue here, 26 C.F.R. § 1.170A-13(c)(3)(ii)(D), requires that a qualified appraisal must include "[t]he terms of any agreement or understanding entered into (or expected to be entered into) by or on behalf of the donor or donee that relates to the use, sale, or other disposition of the property contributed."  Examples include the terms of any agreements or understandings that "[r]estrict[] temporarily or permanently a donee's right to use or dispose of the donated property," or "reserve[] to, or confer[] upon, anyone

-----

          (K) The specific basis for the valuation, such as
          specific comparable sales transactions or statistical
          sampling, including a justification for using sampling
          and an explanation of the sampling procedure employed.

19

1  (other than a donee organization . . .) any right to the income

2  from the contributed property or to the possession of the

3  property."  26 C.F.R. §§ 170A-13(c)(3)(ii)(D)(1)-(2).

4       Another requirement at issue here, 26 C.F.R. § 1.170A-

5  14(h)(3)(ii), regulates how the qualified appraisal places a

6  value on the conservation easement.  A qualified appraisal may

7  use the "before-and-after" valuation method, which determines the

8  fair market value of the property immediately before the

9  conservation easement is granted, and then determines the fair

10 market value immediately after the conservation easement is

11 granted.  The value of the conservation easement, and thus the

12 value reported for deduction, is the difference between the

13 "before" and "after" fair market values.  See 26 C.F.R. § 1.170A-

14 14(h)(3)(i) ("If no substantial record of market-place sales [of

15 properties with comparable easements] is available to use as a

16 meaningful or valid comparison, as a general rule . . . the fair

17 market value of a perpetual conservation restriction is equal to

18 the difference between the fair market value of the property it

19 encumbers before the granting of the restriction and the fair

20 market value of the encumbered property after granting the

21 restriction."); Hilborn v. Comm'r, 85 T.C. 677, 688-89 (1985)

22 (describing the before-and-after approach as "measuring the

23 difference between the fair market value of the property

24 immediately before the easement was granted and the fair market

25 value of the property immediate after the easement was granted;"

26 "[s]tated another way, the question becomes: what was the

27 difference, if any, in the value of the property with and without

28 the easement?").

20

Section 1.170A-14(h)(3)(ii) requires that "[i]f before and after valuation is used, the fair market value of the property before contribution of the conservation restriction must take into account not only the current use of the property but also an objective assessment of how immediate or remote the likelihood is that the property, absent the restriction, would in fact be developed." 26 C.F.R. § 1.170A-14(h)(3)(ii).

Here, the United States argues that by failing to mention the Pledge Agreement and Whitmyre Easement,[7] the Richey Appraisal did not adequately include "[t]he terms of any agreement or understanding entered into (or expected to be entered into) . . . that relates to the use, sale, or other disposition of the property contributed." See 26 C.F.R. § 1.170A-13(c)(3)(ii)(D).[8]  The United States also argues that the Richey Appraisal overestimated the "highest and best use" of the Ketchum Property "before" the Conservation Easement when it left out the fact that the Whitmyre Easement arguably provides for only one home site independently of the Conservation Easement. (U.S. MSJ at 12-17.)

Even if the court were to find that the Richey

---

[7]   The Whitmyre Easement is apparently an easement over two other neighbors' properties, in addition to the Hemingway property, over which the driveway to access the Ketchum Property had to pass. (U.S.'s MSJ at 13.)  The Whitmyre Easement was granted around the same time as the Conservation Easement and similarly limits access to the Ketchum Property to one single-family residence. (Yost Decl. Ex. 40.)

[8]   The United States also argues that the Richey Appraisal failed to take into account the fact that the Conservation Easement was only a partial interest due to co-ownership with the Sterns, and that the Appraisal failed to specify that it was prepared for tax purposes. (U.S. MSJ at 16-17.)

1  Appraisal failed to satisfy the requirements of a qualified
2  appraisal, however, a genuine issue of material fact exists as to
3  whether the Peskys should be excused from those requirements for
4  reasonable cause.  See Crimi v. Comm'r, 105 T.C.M. (CCH) 1330,
5  2013 WL 561347, at *34-35 (2013); see also Rothman v. Comm'r, 104
6  T.C.M. (CCH) 126, 2012 WL 3101513, at *5 (2012) ("Whereas our
7  ruling that petitioners failed to obtain a qualified appraisal
8  generally leads towards a denial of those deductions, the
9  deductions are not disallowed if the failure was due to
10 reasonable cause and not to willful neglect.  Whether petitioners
11 acted with reasonable cause is . . . an issue that must be
12 tried.").

13        While the regulations discussed above provide some of
14 the requirements to qualify a conservation easement for a
15 charitable contribution deduction, 26 U.S.C. § 170 provides that
16 a taxpayer's deduction will not be denied for failure to meet the
17 regulatory requirements "if it is shown that failure to meet such
18 requirements is due to reasonable cause and not to willful
19 neglect." Id. § 170(ii)(II).  "Neither the statute nor the
20 regulations tell us what constitutes reasonable cause in the
21 context of failure to obtain a qualified appraisal." Crimi, 2013
22 WL 561347, at *35.  "However, the concept of 'reasonable cause'
23 pervades the part of the Code relating to the imposition of
24 additions to tax and penalties for failures to comply with
25 certain sections of the Code." Id. (citing 26 U.S.C. §§ 6651,
26 6652, 6664).

27        "Reasonable cause requires the taxpayer have exercised
28 ordinary business care and prudence as to the challenged item."

22

1  <u>Id.</u> (citing <u>United States v. Boyle</u>, 469 U.S. 241 (1985)).  "Thus,

2  the inquiry is inherently a fact-intensive one, and facts and

3  circumstances must be judged by on a case-by-case basis."  <u>Id.</u>

4          As explained by the Tax Court in <u>Crimi</u>:

5          A taxpayer's reliance on the advice of a professional,
           such as a certified public accountant, would constitute
6          reasonable cause and good faith if the taxpayer could
           prove by a preponderance of the evidence that: (1) the
7          taxpayer reasonably believed the professional was a
           competent tax adviser with sufficient expertise to
8          justify reliance; (2) the taxpayer provided necessary and
           accurate information to the advising professional; (3)
9          the taxpayer actually relied in good faith on the
           professional's advice.

10

11  <u>Id.</u> (citing <u>Rovakat, LLC v. Comm'r</u>, 102 TCM (CCH) 264 (2011)).

12          In <u>Crimi</u>, the Tax Court appeared to agree with the

13  argument that an appraisal for real property contained multiple

14  deficiencies, including being prepared four years before the

15  contribution date, incorrectly describing the property as having

16  more acreage than what was actually transferred, and failing to

17  include the date or expected date of the contribution.  <u>Crimi</u>,

18  2013 WL 561347, at *34.  While the court was "doubtful the 2000

19  appraisal was in substantial compliance," the court went on to

20  hold that it need not reach the issue because it "agree[d] with

21  petitioners that their noncompliance would be in any event

22  excused for reasonable cause because they reasonably and in good

23  faith relied on [their accountant's] advice that the 2000

24  appraisal met all legal requirements to claim the deduction."

25  <u>Id.</u>

26          At a deposition, Mr. Pesky testified that "[e]verything

27  I did was done with the advice of my advisors and with my belief

28  and my absolute statement to them that nothing should be done

23

1  that isn't completely legal." (Schwartman Aff. in Supp. of MSJ

2  Ex. 14 at 230:5-8 (Docket No. 106-6).)  When Richey inquired

3  about the terms of the Pledge Agreement and whether its terms

4  should be included in his appraisal, it appears that one of the

5  Peskys' attorneys, Nicholas Marshall, advised Richey that its

6  terms did not apply. (See Yost Decl. Ex. 60.)  The deposition of

7  D. John Thornton also implies that the attorneys at Thornton

8  Byron were intimately involved with decisions regarding the

9  Richey Appraisal, and that it is the firm's responsibility to

10 make sure that all the regulations concerning deduction of the

11 easement are met. (See Schwartman Aff. in Supp. of MSJ Ex. 45

12 ("Thornton Dep.") at 34:23-38:5, 42:10-16 (Docket No. 106-8).)

13        Thus, whether the Peskys are excused from the

14 requirements regarding submission of a qualified appraisal due to

15 reasonable cause is a genuine issue of material fact.

16 Accordingly, the United States' motion for summary judgment based

17 upon failure to comply with qualified appraisal regulations will

18 be denied.

19     C.   Fraud Penalties

20        Section 6663 provides that "[i]f any part of any

21 underpayment of tax required to be shown on a return is due to

22 fraud, there shall be added to the tax an amount equal to 75

23 percent of the portion of the underpayment which is attributable

24 to fraud." 26 U.S.C. § 6663(a).

25        In the context of the seventy-five percent penalty of §

26

27

28

24

6663,[9] "fraud is intentional wrongdoing on the part of the taxpayer with the specific intent to avoid a tax known to be owing." Bradford v. Comm'r, 796 F.2d 303, 307 (9th Cir. 1986) (quoting Akland v. Comm'r, 767 F.2d 618, 621 (9th Cir. 1985)). To establish liability for the civil fraud penalty, "the Government must establish: (1) a knowing falsehood; (2) an intent to evade taxes; and (3) an underpayment of tax." Considine v. United States, 683 F.2d 1285, 1286 (9th Cir. 1982).

The government "must prove fraud by clear and convincing evidence, but intent can be inferred from strong circumstantial evidence." Bradford, 796 F.2d at 307 (quoting Akland, 767 F.2d at 621 (internal citations omitted)) (emphasis added); see 26 U.S.C. § 7454(a) ("In any proceeding involving whether the petitioner has been guilty of fraud with intent to evade tax, the burden of proof in respect to such issue shall be upon the Secretary."). "Because fraudulent intent is rarely established by direct evidence, this court has inferred intent from various kinds of circumstantial evidence. These 'badges of fraud' include: (1) understatement of income; (2) inadequate records; (3) failure to file tax returns; (4) implausible or inconsistent explanations of behavior; (5) concealing assets; and (6) failure to cooperate with tax authorities." Id. (internal citations omitted).

---

[9]     The Tax Reform Act of 1986, Pub. L. No. 99-514, 100 Stat. 2085 (1986), amended 26 U.S.C. § 6653(b) to increase the civil penalty for fraud from fifty percent to seventy-five percent. Cooley v. Comm'r, 87 T.C.M. (CCH) 1025, 2004 WL 406756, at *7 n.4 (2004). The Omnibus Budget Reconciliation Act of 1989, Pub. L. No. 101-239, 103 Stat. 2106 (1989), subsequently removed the civil penalty for fraud from § 6653(b) and replaced it with § 6663. Id.

The United States rests its fraud counterclaim essentially on Alan Pesky's alleged role in failing to disclose or provide a copy of the Pledge Agreement to the IRS and City of Ketchum officials.  From the evidence before the court, the primary actors in the IRS dispute over disclosure of the Pledge Agreement were Alan Pesky's attorneys.  There is evidence that Alan Pesky relied upon Paul Street when determining whether the Pledge Agreement and subsequent Conservation Easement would qualify as a charitable contribution.  (See Schwartman Aff. in Supp. of MSJ Ex. 15 ("Street Dep.") at 134:6-13, 138:4-7 ("[T]here certainly was reliance on [the Peskys' attorneys] to understand that--to identify any major challenges [to a charitable deduction] if [they] saw some.")

From the testimony, it appears that the attorneys had good faith reasons for their decisions, separate from any intent to conceal the Pledge Agreement from the IRS.  In his deposition, D. John Thornton explained that it was his decision not to turn over the Richey Appraisal file, which contained the firm's copy of the Pledge Agreement.  (Thornton Dep. at 40:7-41:15.) Thornton told Alan Pesky that they were not going to provide the Richey Appraisal file because it was the firm's practice not to turn over such information.  (Id. Ex. 45.)  This decision was not obviously unreasonable, as the court agreed that the Richey Appraisal file was privileged before being overturned by the Ninth Circuit.  See United States v. Richey, No. CV 08-452-S-EJL, 2009 WL 595588 (D. Idaho Mar. 6, 2009), rev'd and remanded, 632 F.3d 559 (9th Cir. 2011).

The evidence from which the United States argues that

Alan Pesky fraudulently concealed the Pledge Agreement from city
officials is similarly susceptible to an innocent interpretation.
The United States produces a memorandum from Paul Street to Alan
Pesky explaining that, when asked by counsel for the City of
Ketchum to review the Pledge Agreement, "Lawson[, attorney for
TNC,] and [Street] agreed that we should not distribute the
scenic easement to [City Counsel] because then it could be
distributed to others." (Hatzimichalis Decl. in Opp'n to Peskys
MSJ Ex. 71 (Docket No. 109-4).) As with the allegedly fraudulent
failure to produce the Pledge Agreement to the IRS, the evidence
before the court points to Alan Pesky's attorneys as the primary
decisionmakers regarding strategy before the City of Ketchum.

        Furthermore, even if Pesky was involved in the decision
to allow counsel from the city of Ketchum to view, but not
photocopy, the Pledge Agreement, the evidence shows that Pesky
and the attorneys had a legitimate reason to limit disclosure of
the Pledge Agreement to the City of Ketchum. As explained by
Street in his memo to Alan Pesky, Street's "concern about a
release of the document is that the City will then try to provide
its thoughts and suggestions on changes to the document." (Id.)
Street and Lawson were concerned that the City of Ketchum would
try to make approval of the driveway permit contingent upon
changes to the Pledge Agreement, but the attorneys "didn't really
want to have the city as a partner at [that] stage." (Street
Dep. at 118:15-20.)

        Thus, even assuming that Alan Pesky agreed with his
attorneys' decisions regarding nondisclosure of the Pledge
Agreement, and viewing all evidence in the light most favor the

27

1  United States, the court cannot conclude that a reasonable juror

2  could find it "highly likely" that Alan Pesky's deduction of the

3  Conservation Easement was due to fraud.  <u>See</u> Ninth Circuit Model

4  Jury Instruction 1.4 ("When a party has the burden of proving any

5  claim or defense by clear and convincing evidence, it means you

6  must be persuaded by the evidence that the claim or defense is

7  highly probable.  This is a higher standard of proof than proof

8  by a preponderance of the evidence.").  Because the United States

9  has not produced sufficient evidence to meet its heightened

10 burden of showing fraud by clear and convincing evidence, Alan

11 Pesky's motion for summary judgment on the United States'

12 counterclaim for fraud penalties under § 6663 with respect to the

13 claimed deduction for the value of the Conservation Easement must

14 be granted.

15          IT IS THEREFORE ORDERED that:

16          (1) the Peskys' motion to strike be, and the same

17 hereby is, DENIED;

18          (2) the motions of the Peskys and the United States for

19 summary judgment on the issue of deduction of the value of the

20 Conservation Easement be, and the same hereby are, DENIED; and

21          (3) the Peskys' motion for summary judgment on the

22 United States' counterclaim for fraud penalties under 26 U.S.C. §

23 6663 with respect to the claimed deduction for the value of the

24 Conservation Easement be, and the same hereby is, GRANTED.

25 DATED:  July 8, 2013

26

27  _____

    WILLIAM B. SHUBB

28  UNITED STATES DISTRICT JUDGE

                              28